**STATE of Missouri, Plaintiff-Respondent,**

v.

**Albert SIEMS, Defendant-Appellant.**

No. 35504.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Feb. 3, 1976.

Motion for Rehearing or Transfer
Denied March 10, 1976.

Application to Transfer Denied
May 5, 1976.

Donald V. Fraser, Jr., St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, Brendan Ryan, Circuit Atty., J. Paul Allred, Jr., Asst. Circuit Atty., Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for plaintiff-respondent.

GUNN, Judge.

Defendant appeals his conviction by jury of the offense of sodomy in violation of § 563.230 RSMo 1969. On appeal, defendant raises four points of alleged error, all of which are stated in the abstract, do not state why they are erroneous and thereby fail to comport with the requirements of Rule 84.04. But, nevertheless, we are compelled to reverse and remand the case for a new trial.

The facts, as presented through the prosecuting witnesses, are sufficiently facinorous. The victim, a 12 year old girl, testified that at the defendant's urging, she had placed her mouth on defendant's penis. The defendant categorically denied any libidinous conduct with the victim.

The first point of error raised by defendant, although not properly presented, and that upon which our decision turns, relates to the cross-examination by the prosecutor of the defendant's character witnesses. Two character witnesses, both housewives from defendant's neighborhood, testified that the defendant had a reputation for truthfulness and good moral character. On cross-examination the prosecutor explored the extent of the witnesses' knowledge of

defendant's reputation. In doing so, the prosecutor asked questions relating to previous purported acts of misconduct by defendant—specifically, although there was absolutely no evidence that the defendant had engaged in wife-swapping, the prosecutor persistently burrowed into the matter of wife-swapping and other areas thusly:

(First character witness)

"Q. [Prosecutor] Has any of those 5 to 10 people [persons the character witness had talked to about defendant's good moral character], have they ever told you that they have heard rumors about Mr. Siems' [defendant's] conduct in other places and that they don't approve of what they had heard—not that he did it— just that they don't approve of what they had heard?

A. Well, those that they had heard, they don't believe.

Q. I see. Did they tell you they knew anything about he and his wife's activities in a wife-swapping club.

 *      *      *      *      *      *

[Prosecutor]: That happened in St. Louis, Rolla, Missouri, Cape Girardeau, St. [sic] Genevieve.

 *      *      *      *      *      *

Q. [Prosecutor] Have they ever told you—have you ever heard any rumors from them about that activity?

A. No I haven't.

Q. Never have?

A. No sir.

Q. How would you feel about his personal reputation if that was the situation? Would that cause you to feel differently about him?

A. If what?

Q. If you were aware or heard that Mr. Siems was engaging in wife swapping activities in a club, would you feel differently about his reputation for morality?

A. Well, I would just tell them they was lying, in my—

Q. Right.

A. It couldn't be true.

Q. I see. But you don't know. Now, my question is simply this: If you heard that, okay, if you heard that—

A. If I heard it, yes.

Q. Became aware of that, would you then have a different idea about what his reputation was—not that it's true—just what reputation was?

A. Well, I never heard it.

Q. Well, I want you to assume that you had heard it. Would that cause you—not whether it's true or not, would that cause you to have a different statement to this jury about what his reputation is for morality, wouldn't it?

A. No, it wouldn't.

Q. It wouldn't.

A. Because I can't assume that anyone would mention that. I just can't assume it.

 *      *      *      *      *      *

Q. [Prosecutor] I'm asking if you ever heard any gossip of that nature amongst these people?

A. If I had ever heard of any gossip that—

Q. That Mr. Siems—

A. I've never heard any gossip like that, no.

Q. And you never heard that from any of those five to ten people?

A. No, I haven't.

Q. Now, I want you, not to assume it's true or not, but if you heard that would you might have a different— you'd have to tell the jury he had a different reputation for immorality through a wife-swapping club operating through Missouri.

A. Well, if I had heard that—

Q. You'd have to tell them that.

A. But I haven't heard that.

Q. I know it but I want you to assume that you had heard that, then you would have to tell this jury a different thing, wouldn't you?

A. Well, if I heard it I would have to say—

Q. That's right.

A. (Continuing)—so, but I didn't.

\* \* \* \* \* \*

Q. [Prosecutor] Were those people that you talked to, were they aware that he was arrested and charged with child molestation of ___ [victim's sister] by inserting his hand in her panties and then inserting his finger into her vagina on three or four occasions?

A. They knew that he was accused— let's see, I don't know how to say this. The first I heard Mrs. Siems told me of the charges.

\* \* \* \* \* \*

Q. [Prosecutor] Did you ever think that a person like, you know, could kill the President when the people say—

\* \* \* \* \* \*

Q. [Prosecutor] Have you heard people say, 'Jesus,' you know, 'I know that guy.' 'He wasn't,' you know, 'he'd been a good guy all his life but suddenly he got involved with someone else'—you've heard that, haven't you?

\* \* \* \* \* \*

Q. I understand. You seem like a fine person to me. Let me ask you a very simple question. You know, if you had heard rumors about his actions with other children like the ___ [the victims] and heard rumors about his wife and his activities in a wife-swapping club, wouldn't that cause you to feel that his reputation for morality, that is, what you had heard about him from others certainly wasn't good.

\* \* \* \* \* \*

[Second character witness]

Q. [Prosecutor] Right. Have you ever heard amongst those four people that you talked to that they had ever heard about Mr. Siems and his wife belonging to a wife-swapping club, some twenty couples, that op-erated throughout the State of Missouri?

A. No."

The general rule in Missouri, from which we do not deviate or retreat, is that the State may cross-examine a character witness with reference to defendant's prior arrests and accusations of specific misconduct for the purpose of testing the trustworthiness, knowledge and good faith of the witness. *State v. Johnigan,* 494 S.W.2d 23 (Mo.1973); *State v. Hastings,* 477 S.W.2d 108 (Mo.1972); *State v. Rojano,* 519 S.W.2d 42 (Mo.App.1975). In such cross-examination the State may inquire into mere rumors concerning the character of the defendant. *State v. Curry,* 372 S.W.2d 1 (Mo. 1963); *State v. Richardson,* 364 S.W.2d 552 (Mo.1963). But there are limits to the scope of examination of character witnesses, and the prosecutor here transcended those limits. The State's questions cannot be asked "merely for the purpose of improperly showing other crimes or for the purpose of going into collateral details." *State v. Carroll,* 188 S.W.2d 22, 24 (Mo.1945). And the State's questions must not be argumentative or call for a conclusion or assume facts. *State v. Selle,* 367 S.W.2d 522 (Mo.1963); *State v. Carroll,* supra. Thus, the form of the questions about other acts of misconduct is important. The State had a right to ask in good faith if the witness had heard rumors regarding misconduct of the defendant, for if the witnesses admitted knowing of the rumors, such knowledge may be treated as being inconsistent with previous assertions that the defendant's reputation is good. *State v. Seay,* 282 Mo. 672, 222 S.W. 427 (1920); *State v. Carson,* 239 S.W.2d 532 (Mo.App.1951). But since the witnesses denied having heard the rumors, persistent questioning about the possible effect the hypothesized rumors would have on their testimony was totally argumentative and pursued a highly inflammable prejudicial collateral issue. By propounding hypothetical questions, asking the character witnesses to assume rumors they had never heard, the State brought repeated references of highly immoral misconduct before the jury

in an emotion-charged sex crime case. Such insinuations, unsubstantiated by evidence, could not have been introduced directly and should not have been allowed by an indirect method under the pretext of testing the credibility of the character witnesses.

The following statement from *State v. Selle*, supra, at 529–530 is particularly felicitous to the matter of the prosecutor's cross-examination of the character witnesses:

"In an effort to guard against misuse or abuse, whether by inadvertence or by design, of the accorded right of cross-examination of character witnesses, we have warned (as others also have) that, in cross-examination, it is improper to propound hypothetical questions which assume supposed facts and call for an opinion predicated thereupon. (cites omitted). '(C)ross-examination should not be permitted to be used to covertly convey to the minds of jurors suspicion and prejudice as to a defendant by a recital as facts of supposed matters not appearing in the evidence and wholly outside of the case.' *Pittman v. United States*, supra, 8 Cir., 42 F.2d 793 loc. cit. 797. In other words, prosecuting officials should not be permitted in this fashion to convey to the jury by innuendo and insinuation purported information which they are forbidden to impart directly." (cites omitted).

Clearly, the prosecutor's cross-examination of the character witnesses went beyond the permissible limits indited in *State v. Selle*, supra. Further, the excessively repetitious manner of the inquiries casts doubt as to the good faith purpose of the line of questioning. As stated in *State v. Hastings*, supra:

"[C]ross examination of character witnesses by the State touching their knowledge of prior convictions 'ought to be done in good faith, and the crimes inquired about ought not to be apocryphal, existing alone in the fertile fantasy of a public prosecutor.'"

The questioning here was more than a touching of the witnesses knowledge of defendant's character. The interrogation was quantitatively fulsome and qualitatively deficient.

We also believe that the prosecutor's comment contained in the case relating to defendant's relations with the victim's sister was unnecessary and added more fuel to the fire of prejudice.

█ Inasmuch as we are remanding this case, we must consider the other points raised by defendant as they might reoccur on retrial. Defendant contends that the verdict directing instruction was erroneous, in that it was indefinite as to setting the time of the offense. We note that the transcript fails to reflect that defendant's trial counsel objected to the instruction, and defendant's brief fails to set forth the instruction. Except for the fact that we are remanding for retrial, we would not consider this alleged point of error. *State v. Schulten*, 529 S.W.2d 432 (Mo.App.1975).

The pertinent portions of the instruction under attack provide:

"You are instructed that if you find and believe from the evidence in this case, beyond a reasonable doubt, that in the City of St. Louis, State of Missouri, *during the month of February, 1972*, the defendant Albert Siems did . . . commit the . . . crime against nature. . . ." (Emphasis added).

It is contended that the instruction negated defendant's alibi defense, since the instruction directed a guilty verdict if defendant was found guilty of the crime alleged anytime "during the month of February, 1972." The information stated that the alleged crime took place "on or about the 23rd day of February, 1972." At trial, it developed that the victim could not remember the exact date of the offense. It occurred sometime while her mother was in the hospital from January to March 9, 1972. It was the victim's best recollection that the offense occurred toward the latter part of February, possibly the last week on either a Friday or Saturday night. The defendant testified as to the particular days he had been at the victim's house during the last week in February where the alleged sodom-

ical act took place but denied any offensive conduct.

The defendant placed and limited the focus of his alibi on the last weekend in February. The defendant also testified that by checking his business records he could account for his time for about 75 percent of the entire month of February, and he admitted being in the victim's house approximately two or three times a week during the period of her mother's confinement in the hospital. We find that the defendant was not prejudiced by the verdict directing instruction he challenges.

■■■■ Except where time is of the essence, it is not error to give an instruction that submits the happening of the offense at anytime within the limitation period. *State v. Arnett,* 370 S.W.2d 169 (Mo.App. 1963). See also *State v. Proffer,* 159 S.W.2d 681 (Mo.1942). Time is not of the essence in a crime of the nature here considered.[1] However, the State has the burden of proof to establish the presence of the accused at the time and place of the offense. Therefore, when an alibi defense is interposed, time may be of decisive importance even though not of the essence of the offense. *State v. Clark,* 509 S.W.2d 740 (Mo.App. 1974). With the foregoing principles in mind, we find that the instruction given was not error. When a specific date is presented as the date of the alleged crime, an instruction covering a broad period of time may not be given which would nullify an alibi defense supported by substantial evidence. *State v. Bowles,* 360 S.W.2d 706 (Mo.1962); *State v. Chittim,* 261 S.W.2d 79 (Mo.1953). However, in this case the State did not rely on a specific day or week. The young victim, for understandable reasons, did not report the crime for about four months and could not state precisely when it occurred. Defendant acknowledged being in the victim's house two or three times a week during the month of February. We

believe that the evidence in this case puts the instruction within the holding of *State v. Walker,* 357 Mo. 394, 208 S.W.2d 233 (1948), upholding a verdict directing instruction reciting that the sex crime complained of occurred "on or about the ___ day of December 1945." The court in *Walker* found the instruction "sufficiently limited the time of the alleged offense, for which appellant was convicted, to the facts testified to by prosecutrix." Op. cit. 208 S.W.2d at 238. So, too, here.

■■■■ The third allegation of error relates to a question asked of the defendant on cross-examination which was said to improperly raise the issue of another crime. The prosecutor questioned defendant about the victim's sister and asked:

"Have you ever—during the month of February did you ever put your hand in her pants and stick your finger in her vagina?"

After objection, the prosecutor withdrew the question. Generally, the asking of an improper question is not prejudicial when the witness does not answer. *State v. Holland,* 530 S.W.2d 730 (Mo.App.1975). See also *State v. Scarlett,* 486 S.W.2d 409 (Mo. 1972). However, we do find the question unnecessary and obnoxious, and on retrial of the case it should not be asked.

■■■■ Defendant's final contention on appeal is that the trial court erred in refusing to compel the State to produce the grand jury testimony of the victim. The record fails to disclose any request by defendant's trial counsel for the grand jury testimony, so we need not rule on this matter.

For the reasons previously stated, the cause is reversed and remanded for new trial.

SIMEONE, P. J., and McMILLIAN, J., concur.

---

1. Compare *State v. Palmer,* 306 S.W.2d 441 (Mo.1957), where it was held that time is not of the essence in a statutory rape case, with *State v. Taylor,* 345 Mo. 325, 133 S.W.2d 336 (1939). In the *Taylor* case, time was of the essence because defendant was charged with attempt

to corrupt a "summoned juror," and the evidence showed only one attempt to influence the juror after the juror had been summoned. The instruction was too broad because it encompassed an attempt to corrupt the juror made prior to the time he was summoned.